It's Richardson v. City of Newark, number 19-2527. So you'll have 11 minutes in your opening, and we'll hear from you now. Thank you, Your Honor. This is Anthony Barsamanto with the Magdalena Firm. On behalf of Appellant Rochman Richardson, who is the plaintiff below, I'm reserving four minutes for rebuttal. So this is an excessive force case and a wrongful arrest case filed under 1983. The plaintiff was shot after being pursued on foot by the defendant, Appellee Officer Laurie. The court below dismissed it on grounds of qualified immunity surrounding Laurie's conduct. Since that's the issue, I think that that issue is essentially whether Officer Laurie violated a clearly established right of which a reasonable officer would have understood under the same circumstances, and the plaintiff contends that he did. The Garner case, the seminal case on this issue, establishes that officers, or rather citizens and other persons, are entitled to freedom from excessive force as a form of seizure unless an officer has probable cause to believe that the suspect posed a threat of serious physical harm, either to the officer or to others. Isn't this case, counsel, about the threat of harm to others? That seemed to impress the district court. Right. That was what the district court based its decision on, on the grounds that the gunshot was, in the district court's analysis, prompted by the fact that the defendant, I'm sorry, the plaintiff rammed through a doorway right before being shot, and it looked like a burglary in progress, essentially. And so the officer, according to the court, would have reasonably thought that the plaintiff was threatening people inside. Now, I think that that analysis fails to take into account that the officer had already opened fire. There was a bullet hole on the side of the house, and the plaintiff was standing next to the door, which as it turned out to be his door, and when he was already under fire he lurched into the door and broke through with his shoulder. Did he stop first and raise his hands at that point? That's my understanding, yes. He was at the door, right outside the door. He was standing there facing down the officer, and I think the officer tripped over and opened fire, and then he broke through the door. Well, there may be some question as to what the officer thought if he took off again. Is it clear when the officer opened fire the second time? I thought that, at least the way that I looked at the facts, was that Mr. Richardson took off. Well, there's no denying that Mr. Richardson took off, first of all, at the outset, which is the basis of his obstruction plea. He was told to stop. That stop was found to be unjustified in the criminal court that handled the situation. He took flight after he was told to stop. He got to his own house, and then the officer said, show me your hands, don't move. The plaintiff complied. Then the officer stumbled, and the plaintiff did run again and get to the side entrance of his apartment. It was down the same causeway where they were looking at each other. Then when the officer tripped and fell, he got up and fired a round, missed, and that's when the plaintiff shouldered his way through the door. I understand basically he didn't want to put his hands in his pockets to get his keys, but I didn't put that in the brief. He hadn't broken any doors before the officer opened fire. Was he facing the door, or was he facing down the culvert, down the alley? I think they were staring each other down. He was at the door. The officer was at the further end of the causeway. There was a clear view, and they were basically staring each other down. The gunshot lurched to the left to get through the door essentially. What is the clearly established right here? Well, I think that, frankly, you don't have to look further than Garner, because in Garner the issue was there the suspect had actually committed a burglary in the dark of night, and the officer in Garner shot the suspect simply to terminate a pursuit, which the Supreme Court held doesn't justify deadly force in and of itself in the absence of reasonable fear for other's safety. I think a reasonable fact finder could find that the officer was simply using deadly force to terminate a pursuit or a flight. The flight in question was ultimately adjudicated to be an offense. The plaintiff pled guilty to obstruction on the grounds that he failed to comply with the command to stop. It did justify an arrest at that point under New Jersey criminal law, but we contend it didn't justify deadly force and that the officer, under all the circumstances, the officer really was just opening fire contrary to Garner just to terminate a flight. Is this an issue of fact in this case, exactly what the officer was trying to do when he first fired his gun? Well, I would contend so. I mean, there's a larger issue of fact that the district court sort of avoided, and that is that the officer accused the plaintiff of being armed from the outset of having a concealed gun in his pocket, which he was charged with. The charge was dismissed on a suppression hearing, and he has always denied that he ever had a firearm on his person, and he wasn't arrested. I mean, he wasn't found with a firearm on his person when he was arrested and handcuffed. The officer, Lori, says he found it outside in that same alleyway or causeway. And so, you know, we briefed that issue thoroughly below, but the court found that it was irrelevant because even if he was unarmed, breaking through the door was the basis for the court's finding, which we contest as sufficient, you know, which we contest closes down the... With respect to the, well, with respect to whether he had a gun or not, I guess there's a dispute about it. But don't the parties agree at least there was a bulge in his pocket? And I think your client said it was a pack of sunflower seeds, I think, right? I think he had something in his pocket. But, you know, the defendant, the appellee, wanted a, you know, video in the appendix to show that it was dark out. So if it was dark out, how would he have been so sure it was a gun? And second of all, there's a whole factual picture here. He initially stopped and handed the officer his bag with a sandwich and a beer in it and told him he lived around the corner, and there was no basis to stop him in the first place. It just, you know, we contest what the officer thought he saw, and we contest that he even had a gun or that the officer believed he had a gun. And the only people who are making contrary claims in that regard are the two parties. So he said, she said there were other officers there who never saw a gun either before, during, or after the events and the arrest. So we think it's a reasonable question of fact. There's a material dispute. Excuse me. When Mr. Richardson took off initially, am I correct that Officer Lahrie shouted, gun, gun? That's what the plaintiff himself recalls, yes. And I think he wrote it in his police report as well. Okay. Thank you. So, you know, we contend that this is, you know, that the officer's perceptions are reasonably disputed. The fact that the officer charged the plaintiff with possession of a gun, which he didn't even have on his person when he was arrested. The fact that taking the officer's story to be true, the plaintiff would have dropped the gun in plain view of the officer before the officer actually shot the plaintiff. So the officer shouldn't have believed that he had a gun when he actually wounded him. And, you know, the credibility issues surrounding the officer insofar as nobody else even saw the gun where he alleged it fell all make it a question of fact for the jury. And as to whether the officer's alleged perceptions of the situation were reasonable, his belief that the plaintiff threatened anyone. And we also contend that there are two seizures in this case, essentially. The initial seizure, which was the investigatory stop that a criminal court found to be unjustified. And then the arrest itself, which terminated the affair, the final seizure, which was justified by his guilty plea, essentially, but we contend it was the method of effecting it, deadly force, that was unconstitutional. So we think that even though he pleaded guilty to the initial, to obstructing, justifying an arrest, that doesn't justify the initial stop itself and it doesn't justify the excessive force. So to the extent that you can analyze this as a false arrest separately from excessive force or as a second cause of action, we think that his guilty plea to obstructing doesn't preclude that. But our main case is excessive force. Well, Counselor, you've got four minutes on rebuttal. You're over time. So Judge Sirica or Judge Roth, do you have anything more you'd like to ask? No. No. Okay, thank you. We'll get you on rebuttal. All right, thank you. We'll hear from Mr. Antwon. Mr. Antwon? He is on the call. I wonder if he might be muted. Sorry, this is my line. Sorry about that. Can everyone hear me clearly? Go ahead. We hear you. So first I just wanted to clarify the facts so that each part that's important is taken into consideration. So, again, this situation started off, and I'm just going to focus on the facts for now that are relevant to the excessive force claim, but this issue started off where Officer Lori encountered Plaintiff Richardson, at which point Plaintiff Richardson begins to flee. And then Officer Lori chases after him. As one of your owners stated before, he yells out, Gun, gun. Plaintiff completely ignores the officer, doesn't slow down, doesn't acknowledge the officer's request for Plaintiff to stop. And at this time there are two officers. So Officer Lori initially loses track of the suspect, and his partner ends up tracking Plaintiff down and chasing Plaintiff down the street. And the partner says over the radio, you know, he's backing up towards Wharton, so stay where you are and keep an eye out for him. At this point Officer Lori does spot and identify Mr. Richardson, and they're on two opposite sides of basically a chest-high fence. And it's important because that means that Officer Lori is not able to see all of Plaintiff Richardson's body, he's not able to determine whether it's the gun. But acting consistently with the belief that there is a gun, he points the gun at the plaintiff and tells him to put his hands where they can be seen. Plaintiff complies for the first time during his chase, and I know at this point it's only a little less than a minute, the chase has been occurring, maybe 50 seconds. And so at this point Plaintiff puts his hands in the air and the pursuit should be terminated at that point. But as Officer Lori begins to walk around the fence, he stumbles on the curb, and at this point Plaintiff Richardson then begins running away again. And this time he runs to the house on the other side of the fence, and he actually puts his hands on the doorknob, and this was confirmed. This is stated in the opinion, it's also part of the record. But as Officer Lori then comes around because he sees that Plaintiff is trying to run again, he trips on a bag of planks or on a stack of planks or wood that's on the floor, which is actually part of the gate, apparently that was on the floor, and he falls on his knees and his hands. So at this point he's vulnerable, and he's in a position where he can't run for cover, he can't really respond. It's at this point, after ignoring previous commands, after reinitiating the pursuit by running away, Plaintiff then turns immediately towards Officer Lori. And though it may have been a stare-down, this isn't a several-minute stare-down, this isn't a prolonged stare-down, this is a split second before Officer Lori now is already pulling out his gun to shoot because at this time the sudden movement, the sudden turn is telling Officer Lori that he's in danger because this Plaintiff, who he believes to be armed, has turned around and is about to shoot. So at this point, this is the first shot. This is the first shot that Officer Lori fires, and he misses. So at this point, when he misses, the Plaintiff turns around, shoulders his way into the building, breaking the door, breaking the lock, and goes into the building, and the door shuts closed behind him. Officer Lori runs next to the door, he kicks the door in, and then he sees Plaintiff trying to open another door that leads to a stairwell, that leads to the front of the house, which leads to other apartments in the house because this is a three-family apartment, and he's in the basement apartment, and he's opening the door to the stairwell that leads to the rest of the house. And so at this point, Officer Lori comes in, and at this point, Plaintiff is starting to finally open the door, and he has his both hands on the door, and this is what he testified during his deposition, opening both hands on the door, he's back towards Officer Lori, and then he starts turning towards Officer Lori, and there's a table between them. Officer Lori can't see his hands. Officer Lori then shoots him in the back of the leg, and even then, Plaintiff Richardson doesn't want to stop. He keeps trying to go further until his leg finally gives out. He falls. Officer Lori immediately handcuffs him. When Officer Lori's superior finally comes in, he has the superior watch over the Plaintiff while he goes out and finds the gun. And so this is the factual circumstance of the chase, and all the circumstances that I think are important. So this is the context in which the pursuit has to be analyzed. Now in this respect, Plaintiff is the main crux of Plaintiff's argument appears to be that the court should have given more precedence to the fact that he allegedly did not have a gun and to the fact that it was his house that was being broken into. However, Plaintiff keeps forgetting that the standard is not from the plaintiff's perspective or the knowledge that the plaintiff had at the time. The standard is from the knowledge that the officer had at the time. And at the time, the officer didn't know that was his house. At the time, the officer believed that he had a gun. Counsel, did Officer Lori know his home address? I mean, wasn't that one of the things you were talking about? He said, where are you going? I'm going home. And didn't he mention where he lived? That's exactly where he ran back to. Yes and no, Your Honor. So the situation was they were on Van Vechten Street when they first encountered each other. On Van Vechten Street, Plaintiff said, my house is right there on the corner. That corner would have been Van Vechten Street and Ludlow Avenue. So Plaintiff's house was not at that corner. But to the extent that Plaintiff alleged that, then Officer Lori would have believed that that corner house at Van Vechten and Ludlow was his corner. The pursuit and the standoffs, and, again, from the point that there was a standoff until Plaintiff was eventually shot, was only 40 seconds long, very quick. And so that standoff happened on Working and Ludlow, which is the next street over. So Officer Lori had no knowledge that that was his house. And even then, what Plaintiff is asking for is that in the midst of these series of standoffs over the course of less than 40 seconds, Officer Ludlow should say, well, wait, did he say before that his house was on the corner of Ludlow? Well, maybe this house is it. Maybe I should give him the benefit of the doubt and just assume that this is his house. Or maybe I should assume that, you know, this apartment, if not his apartment, he's breaking through to get to another apartment that's actually his. It's just a type of second guessing of officers. But the Supreme Court has stated we should not be doing. And so with respect to that, I think he's selling the Hughes directly on point. It was a case multiple times cited by the Supreme Court. I'm sorry, by the district court as well as cited in my brief. And in that case, you had a woman who had some mental issues and had a knife, and there was a report that she was hitting trees and she was moving towards another woman named Chadwick. And so the woman's name was named Miss Hughes. And so she was only a few feet away from Miss Chadwick. And it seemed like she was about to attack him. And so she didn't even make any sudden movements. It was the prior erratic behavior and how close she was to the other suspect that had the officer simply zip down and shoot at her and injure her. And so in that situation, the dissent even said, well, she didn't move at all, and she was calm at the time, so that the officer shouldn't have shot. But notwithstanding the dissent's objection, the Supreme Court still stated that the shooting was justified or at the very least entitled to qualified immunity because this was a woman, even though she was friends with Miss Chadwick, even though she was a neighbor with Miss Chadwick, and even though she had only suggested to Miss Chadwick that she was going to injure the dog. And that's really what the incident was about. None of this information was available to the officer, and the officer couldn't be charged with knowledge of their relationship and knowledge of the mitigating factors that would show that Miss Chadwick wasn't in danger. And so the Supreme Court – So what's the name of the case you're talking about? I'm sorry, maybe I missed that. Casella v. Hughes. So that's K-I-S-E-L-A v. Hughes. I may be pronouncing it wrong. Okay. And so in that case, the mere fact that Miss Hughes was in a situation where she posed an imminent threat to another third-party person was sufficient to apply qualified immunity. And by the same token, with respect to the argument that, well, there was no gun or we don't know that there was a gun, this matter has been addressed multiple times before. The cases I cited mainly were Condé v. Atlantic City, as well as Carswell v. the Borough of Homestead. And in both of those cases, the plaintiff actually had no gun, or at least the decedent had no gun, but the officers believed they had the gun. And so the question wasn't whether the officers subjectively believed there was a gun. The question was an objective analysis, whether they reasonably believed that there was a gun. And that's another problem with plaintiff's arguments. He's saying the jury should be allowed to determine whether the officer was reasonable in thinking that there was a gun. But that defeats the whole purpose of qualified immunity. It's an objective analysis. It doesn't matter what the officer's intentions were when he arrested the individual. It doesn't matter what the officer's intentions were when he shot the individual. The real matter is based off all the facts and information that was available to the officer and what the officer could reasonably have believed, whether a reasonable officer in that same situation had made the same choice. And so under that standard, Officer Lauri, at the very least, is entitled to qualified immunity. But as the district court decided, he was also entitled to finding no liability because his actions were objectively reasonable. Counsel, hypothetically, if the first shot had hit Mr. Richardson, would he still be entitled to qualified immunity? Yes, because the standard is not the level of injury or damage that the suspect or that the plaintiff received. The standard is whether the action was off. But my point is that you relied pretty heavily on the fact that he pushed his shoulder into the door and busted into the house. He had not done that yet, I don't think, right, when the first shot was taken? Certainly, Your Honor. And so this is something I just wanted to clarify. So although all of the circumstances are important, the main prevailing factors are plaintiff's repeated noncompliance and the potential danger that he posed both to the officer and to third-party standards. So looking at the first firearm discharge, the officer was in a vulnerable position, and he believed that this person had a gun and they made sudden erratic movements at the time that he was in a vulnerable position. Those three factors are the most salient and important factors as to why his actions were objectively reasonable. The ramming of the door is a factor that's, again, relevant to the second shooting, but even then it's a combination of the erratic movement as the plaintiff started to turn towards the officer and the officer's belief that he had a gun. And, again, his belief that he had a gun is an objective reasonableness test, which under cases like Condé was justified at the time. A similar case would be Martin for the estate of Webb versus City of Newark 762 up approximately 78. And in that case, it dealt with an officer who was, again, going to arrest the individual who was fleeing, who was acting erratically, and who jumped into a car. The officer tried to stop the door from closing, and the individual took off, and the officer fired his shot, because, again, he believed he was in danger of being injured in that situation. And, again, it was from an objective standpoint. You have a couple of minutes to go. Your adversary pointed to Tennessee versus Garner as providing the clearly established law that we're going to look at for qualified immunity purposes. What is your reaction to that? So, again, Garner was limited to some extent by Supreme Court cases like White and Supreme Court cases like Gisela, and they pointed out that the progeny of a lot of cases like Graham and Garner had analyzed these matters at too high a level of generality, and that's the exact same thing that Plaintiff is doing. He needs to analyze or identify a case which involves sudden movements, a noncompliant person who is trying to flee. And that should be the context within which he provides some type of case-by-case guidance. He's identified no such case, and the cases that I have identified should end in circumstances like that. Officers are entitled to qualified immunity. They're entitled to protection in that respect. Does that answer your question? Yes, it does. Okay. So, seeing as I'm running out of time, I just wanted to cover the false arrest issue real quick. And with regard to false arrests, this is a situation where Plaintiff is alleging or Plaintiff pled guilty to obstruction of justice. So the issue of resisting arrest, contemplating that the arrest was still improper, is inapplicable, because, again, he's under obstruction of justice, which has no such issue. And the fact that he pled guilty, waived his right to have a trial, waived his right to challenge probable cause, means that he's waived that issue and that he's lost on that issue. Another case that underscores that, failed to be city of Pittsburgh, dealt with the same situation, where the plaintiff in there pleaded to lesser offenses than he was originally charged with, and the guilty plea inherently included an acknowledgement that probable cause existed to arrest him for at least some offense. And so under HEC, the Third Circuit, in that case, found that the false arrest claim was barred. And so, with respect to that, the false arrest claim, for the exact reasons said by the District Court, is no longer applicable. Given that Officer Lurie's actions were justifiable, given that Officer Lurie's actions were justifiable, certainly the city of Newark, there's no more than a claim after them. Any more than a claim that acknowledges this has to be based off of a constitutional violation. So if there's no underlying constitutional violation, there can't be a claim against the city. I provided in my briefing a number of other alternative reasons, which certainly do not have to be reached, because, as I stated before, the qualified immunity is applicable here, Officer Lurie's actions were objectively justifiable. However, if Your Honors have any questions about any of those other issues I raised or would like me to address any of those other points, that would be more than welcome. Well, your time is up, but I will ask Judge Sirica and Judge Roth whether they have anything they'd like to ask. No, I'm fine, thank you. I'm fine, thanks. Okay, thank you. Thank you so much, counsel. And now we'll hear your adversary, the appellant, on the rebuttal. Thank you, Your Honor. Well, I think that the difference between that Casella case and this one is that in the Casella case, the suspect was clearly wielding a weapon, and that doesn't seem to have been disputed. But in this case, there is a dispute as to whether the plaintiff had a weapon that justified this alleged fear on the part of the officer. Back to the point about him having a bulge, the officer's claim wasn't just that he saw a bulge, it was also that he actually saw the gun and saw the handle of the gun, which is contested and wasn't adjudicated below because there was no conviction for possession of the gun. But, counsel, wasn't there something in the record? Even your client said, I had something in my pocket, right? I understand he didn't say, I have a gun in my pocket, but he said he had something in his pocket that caused the bulge, right? I believe he did, yes. But that wasn't why the officer said that he thought he had a gun. The officer said that he actually unequivocally saw a gun, which is contested. In a lot of these cases, there's that issue of generality and specificity after Garner. But I think that in this case, the facts of Garner are particularly close to the facts of this case, since the officer shot a suspect for refusing to comply with the command to stop. Not only does the general principle apply, but it so happens that the facts apply too. And other cases involve different sets of facts, like some of the cases cited by the defendants had to do with car cases and acting dangerously with vehicles, or like the Casella case in which the suspect really did have a weapon, clearly, in the view of the officer, it seemed like she could hurt somebody with it. This case is different. This case was a suspect who was fleeing, who was refusing to comply with the command to stop in a residential area, in the curtilage of residential homes. And in that case, that seminal case, the Supreme Court found that it was unconstitutional to use deadly force simply to terminate a flight, which is what happened here. And I think a reasonable fact finder could find that the case has basically the same story as opposed to, oh, he's trying to stop a burglary about to happen because he opened fire before the guy broke into the house. And I think, you know, the issue of, oh, he told the officer his house was at the corner, that's another thing that a reasonable fact finder has to analyze, because the streets, you know, there's like two corners pretty close together. There's like a cross street and then Ludlow Street, which is just past the cross street. There are facts at play that a reasonable fact finder could interpret such that the officer wouldn't have, a reasonable officer wouldn't have believed that he was threatening anyone, threatening strangers or breaking into somebody else's house. Excuse me, am I correct that in Garner, the court determined that the officer didn't have probable cause to believe that Garner was armed or posed any physical danger to himself, whereas in this case, the officer claims he thought he was physically endangered and then it's a question of what a reasonable officer under those circumstances would believe. That's true that in Garner, the officer didn't claim to believe to be personally threatened. But in our case, we contest that the officer, we contest the officer's claim that he felt threatened or that the suspect was armed, that he reasonably believed the suspect was armed. So if the fact finder rejects his claim that he thought that the suspect was armed, and as it turned out, he wasn't by the time they arrested him, if the fact finder rejects that claim, then it's basically Garner. He's not in fear of the plaintiff's weapon. He's just trying to terminate a flight, which he can't do under Garner. Counsel, you're out of time, but I will ask my colleagues if they have any other questions. Nothing further. I do not. Okay, great. Well, I want to thank counsel for their excellent briefing and argument. We will take the case under advisement. And we wish counsel and their families good health and hope you stay safe.